```
 1                IN THE UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF ALABAMA
 2                        SOUTHERN DIVISION

 3      * * * * * * * * * * * * * *
                                    *
 4      UNITED STATES OF AMERICA,   *   CRIMINAL NO.:  16-0040-KD-B
                                    *
 5      VS.                         *   FEBRUARY 12, 2016
                                    *   COURTROOM 1A
 6      CLARENCE EDWARD EVERS, JR., *   U.S. FEDERAL COURTHOUSE
                                    *   MOBILE, ALABAMA
 7           Defendant.             *
                                    *
 8      * * * * * * * * * * * * * *      AUDIO RECORDING

 9

10          DETENTION HEARING AND PRELIMINARY EXAMINATION
                  BEFORE THE HON. SONJA F. BIVINS
11               UNITED STATES MAGISTRATE JUDGE

12                         APPEARANCES

13      FOR THE GOVERNMENT:       Maria E. Murphy, Esquire
                                  Assistant U.S. Attorney
14                                U.S. Attorney's Office
                                  63 S. Royal Street, Suite 600
15                                Mobile, Alabama  36602

16      FOR THE DEFENDANT:        Dennis J. Knizley, Esquire
                                  Attorney at Law
17                                7 N. Lawrence Street
                                  Mobile, Alabama  36602
18
                                  Jason Bradley Darley, Esquire
19                                Darley & McGough, LC
                                  Attorneys at Law
20                                1751 Dauphin Street
                                  Mobile, Alabama  36604
21
        TRANSCRIBED BY:           Mary Frances Giattina, CCR, RDR, CRR
22                                Official Court Reporter
                                  P. O. Box 3021
23                                Mobile, Alabama  36652-3021
                                  (251) 422-4410
24
             Proceedings recorded with digital recording equipment.
25                  Transcript produced by computer.
```

1                        I N D E X

2   WITNESS:                EXAMINATION:              PAGE:

3   1.   Special Agent Kandace Whitehead
                             Direct-Ms. Murphy            3
4                            Cross-Mr. Knizley            31
                             Redirect-Ms. Murphy         60
5

6   Government and Defendant Rest in Preliminary Hearing    67

7   2.   Jean B. Evers     Direct-Mr. Knizley           68
                           Cross-Mr. Knizley            77
8                          Redirect-Mr. Knizley         82

9   Defendant and Government Rest in Detention Hearing    86

10  Certificate of Completion                          87

11

12

13

14                      E X H I B I T S

15      (All exhibits were premarked unless otherwise noted.)

16  EXHIBIT:                   MARKED:          RECEIVED:

17  Government's Exhibit A                              5

18  Government's Exhibit B (Not offered.)

19

20

21

22

23

24

25

```
1          (February 12, 2016, 11:51:20 a.m.)  (In open court.)
2          (Defendant present in court with Counsel.)
3              THE CLERK:  We're on the record, United States of
4   America versus Clarence Edward Evers, for detention hearing
5   and preliminary examination.  What says the Government?
6              MS. MURPHY:  We're ready, Your Honor.
7              THE CLERK:  What says the Defendant?
8              MR. KNIZLEY:  Ready.
9              THE COURT:  Okay.  We'll begin with the preliminary
10  hearing.
11             MS. MURPHY:  Yes, Your Honor.  We would call Kandace
12  Whitehead.
13             MR. KNIZLEY:  Your Honor, are you treating this as
14  both of the hearings at one time, and is that the witness for
15  both issues or just simply as to probable cause?
16             THE COURT:  Let's go ahead and do them both
17  together.
18             MR. KNIZLEY:  Yes, ma'am.
19             THE COURT:  And that way, she won't have to take the
20  stand twice.
21             SPECIAL AGENT KANDACE WHITEHEAD,
22        having first been sworn, testified as follows:
23                   DIRECT EXAMINATION
24  BY MS. MURPHY:
25  Q.  Could you state your name, and spell your last name,
```

1    please.

2    A.    Kandace Whitehead.  W-h-i-t-e-h-e-a-d.

3    Q.    And how are you employed?

4    A.    Department of Homeland Security, Homeland Security

5    Investigations.

6    Q.    And as part of your responsibilities, you were involved

7    in the investigation involving Clarence Edward Evers, Jr.?

8    A.    Yes.

9    Q.    And is he present here in the courtroom today?

10   A.    Yes.

11   Q.    Could you please point him out and tell us what he's

12   wearing?

13   A.    The orange shirt and pants.

14         MS. MURPHY:  Okay.  And if the record may reflect

15   the witness has identified the Defendant.

16   BY MS. MURPHY:

17   Q.    Ma'am, you are the affiant in this case, and you did the

18   affidavit?

19   A.    Yes.

20   Q.    Do you recognize that (indicating)?

21   A.    Yes.

22   Q.    And to the best of your knowledge, are those facts still

23   true and correct?

24   A.    Yes.

25         MS. MURPHY:  Your Honor, at this time, we would move

1  to introduce Government's Exhibit A, which is the affidavit in

2  this case.

3          MR. KNIZLEY:  No objection.

4          THE COURT:  Okay.  So moved.  It's accepted in.

5          MS. MURPHY:  Thank you, Your Honor.

6      (Government's Exhibit A was received in evidence.)

7  BY MS. MURPHY:

8  Q.   Ma'am, as part of your investigation and as part of your

9  history investigating cases for HSI, are you familiar with the

10  sex trade in Thailand?

11 A.   Yes.

12 Q.   And what do you know about that?

13 A.   It's rampant over there.  There's businesses set up just

14  for that.

15 Q.   Is Thailand considered a hub for the sexual exploitation

16  of minors or the commercial sex trade of minors?

17 A.   Yes.

18 Q.   And are you familiar with some of the reasons for the

19  rampant commercial sex trade of minors?

20 A.   It has a lot to do with the poverty that's over there and

21  in addition with the corruption with law enforcement.

22 Q.   And, in fact, you've previously read, and we'll explain

23  in detail, but you've previously read the Defendant's Gmails

24  and Facebook postings and some other electronic communications

25  that he had?

1    A.    Yes.

2    Q.    Are you familiar with a communication that he made

3    concerning skinny kids, a skinny kid?

4    A.    Yes.

5    Q.    And what did he say about that?

6    A.    That he was hungry and looked like he could use the money

7    to buy food, something to eat.

8    Q.    The money from?

9    A.    From having sex.

10   Q.    And is there -- does there seem to be, based on your

11   experience, a regular or a high season for the commercial sex

12   trade?

13   A.    It does seem that way.  There's on seasons and off

14   seasons.

15   Q.    And are there specialized -- I hate to use that word, but

16   are there particular areas or cities where it is more open and

17   notorious than other cities in Thailand?

18   A.    Yes.

19   Q.    Are you familiar with the City of Pattaya?

20   A.    I am.

21   Q.    And that is a beach town that is frequented by foreign

22   tourists?

23   A.    Yes.

24   Q.    And is the commercial sex trade a particular problem

25   there?

1    A.    Yes.

2    Q.    In fact, I think you alluded to it earlier, are there

3    entire -- an entire industry devoted to or developed around

4    the commercial sex trade in Pattaya?

5    A.    There is.

6    Q.    And what are you referring to there?

7    A.    Minor children.  It could be men, women, boys, girls.

8    Q.    And they flock to that area?

9    A.    They do, because of the tourists coming in.

10   Q.    Okay.  And are there particular room arrangements that

11   are made because of the sex trade?

12   A.    There are.  There's long-term hotels, long-term housing

13   that's all -- already furnished.  And some of the bars also

14   have rooms that they rent hourly that may be in the same

15   building as the bar.

16   Q.    Okay.  And you referred to the bars.  Are there other

17   ways in which they are specific to -- different bars are

18   specific to particular sex trades?  Do they have a board?

19   A.    Yes.  They have a board of the employees with -- it may

20   have a name and a number on it.  When I say "employees," I'm

21   referring to the boys.

22   Q.    That are available for sex?

23   A.    Yes.  And they dance or put on a show.  And they have

24   their number, and their number corresponds with whatever it is

25   on the board.

1   Q.   Okay.  And then could a customer then select a number

2   from the board and make arrangements for a short-term sexual

3   liaison?

4   A.   Yes.

5   Q.   And is it unusual for the families to become involved in

6   the sexual exploitation of the children?

7   A.   No.

8   Q.   And what can you tell us about that?

9   A.   They're so poverty-stricken and they need the money so

10  bad, that's what they resort to.

11  Q.   And, in fact, did the Defendant exhibit some knowledge of

12  that fact in his e-mails that you read?

13  A.   Yes.

14  Q.   And do you recall what that was?

15  A.   (No audible response.)

16  Q.   Was he making specific payments to someone other than

17  children?

18  A.   Yes.  There were wire transfers.

19  Q.   To?

20  A.   To an individual that's an older -- that was identified

21  as being an older lady over there.  And when investigators

22  went to interview her, she had her -- her grandson was there.

23  They tried to talk to her grandson, and he wouldn't talk to

24  her -- talk to the investigators.

25  Q.   Is it based on your experience not uncommon for the

1    adults in the family to act as intermediaries or basically

2    pimps receiving money and splitting up the money for the

3    services of the children?

4    A.    That's common.

5    Q.    Is it easy for the Thai police to prosecute these cases?

6    A.    No.

7    Q.    And do you have some reasons why this is not done?

8    A.    Because of the poverty, because of the money, people

9    don't want to come forward as witnesses, and also the

10   corruption with the law enforcement itself.

11   Q.    Is it dangerous for these children to come forward as

12   witnesses?

13   A.    Yes.

14   Q.    All right.  Ma'am, this case started in December of 2014?

15   A.    It did.

16   Q.    And how did it start?

17   A.    A victim went to a source of information, a

18   non-government organization, which is a shelter in Thailand,

19   and that individual reached out to our attache office, which

20   is in Bangkok.

21   Q.    Okay.  And reported what?

22   A.    They reported that they had a victim come in and the

23   information that they gave.  And then through going through

24   e-mail addresses and IP addresses, they narrowed it down to an

25   individual in Evergreen, and narrowed it down farther to being

1  Mr. Evers.

2  Q.   And what did the victim say Mr. Evers did to him?

3  A.   Had sex with him, abused him.

4  Q.   And just a very short overview or summary of this case

5  involves investigation that Mr. Evers traveled to Thailand

6  regularly during the summers off from school at least since

7  2002?

8  A.   Yes.

9  Q.   And that he was involved in commercial sex acts with

10 children?

11 A.   Yes.

12 Q.   And that he photographed children --

13 A.   Yes.

14 Q.   -- in sexual positions?

15 A.   Yes.

16 Q.   Okay.  Now, as to the -- how much evidence there is, or

17 to the weight of the evidence, there's the victim that has

18 reported these crimes; correct?

19 A.   It is.

20 Q.   A search was at some point done of the Defendant's home?

21 A.   On April 1st, 2015.

22 Q.   And at that time, you located travel documents?

23 A.   Yes.

24 Q.   And they corroborated the travel to Thailand?

25 A.   Uh-huh.

1    Q.   On a regular basis?

2    A.   It did.

3    Q.   And you also found lodging documents confirming that he

4    was making arrangements for a long-term room rental on

5    different, different years?

6    A.   That was through the e-mails.

7    Q.   Through the e-mails.  Pardon me.  He also made

8    arrangements for visa applications, taxi services --

9    A.   Yes.

10   Q.   -- that kind of thing.  Okay.  Then you indicated that

11   there was a search warrant executed on April 1st of 2015.  In

12   addition to the travel documents that you found, did you find

13   financial records?

14   A.   Yes, we did.

15   Q.   And what did those financial records indicate?

16   A.   It was a passbook, I believe is what it was called, but

17   it's like an account, your checking, checkbook register,

18   similar to that but for a bank in Thailand.

19   Q.   Okay.  And through subpoenas, did you find where Mr.

20   Evers was transferring money from an account here in Alabama

21   to the bank in Thailand?

22   A.   Yes.

23   Q.   Did you also find little notebooks?

24   A.   Yes.

25   Q.   And what did those document?

1   A.   It documented packing lists about his upcoming travel to

2   Thailand.  He would put -- he would write on the front of the

3   little notebook "TH2014."  And then inside of it, it would

4   have a list of things he needed to take, a list of things that

5   might already be there, a list of names and what looked to us,

6   to the investigators, like a price list.

7   Q.   Okay.  It seemed to indicate the names of different Thai

8   boys?

9   A.   Yes.

10  Q.   And payments made to those Thai boys?

11  A.   Yes.

12  Q.   Additionally, were there photographs found of the

13  Defendant with young Thai boys?

14  A.   Yes.

15  Q.   Did you also find a story that he had written?

16  A.   Yes.

17  Q.   And what was that about?

18  A.   It's fairly thick.  We just refer to it as a narrative.

19  Didn't know how to describe it the best way, but it was --

20  it's a story that was written about a counselor at a camp and

21  sexual interactions with the other boys at the camp.

22  Q.   And when you say "sexual interactions," it was explicit;

23  was it not?

24  A.   Yes.

25  Q.   And you found books and magazines that you could classify

1  as erotica?

2  A.   Yes.

3  Q.   You indicated that you had issued subpoenas to different

4  electronic media, including Google?

5  A.   Right.

6  Q.   You identified that the Defendant had a Gmail account?

7  A.   He does.

8  Q.   Okay.  And directing your attention, if you need it, to

9  paragraph 27, page 10, of your affidavit, can you tell us what

10  that packing list that was gotten from Google refers to?

11  A.   There was a page that had -- no, this wasn't the -- the

12  drive content.

13  Q.   Well, first, let me -- the drive content.  It's a

14  document dated August 3rd of 2014 --

15  A.   Yes.

16  Q.   -- making what appears to be reference to his 2015 trip?

17  A.   Yes.

18  Q.   And under the category of "Packing"?

19  A.   It had a list of clothing items, computer equipment, a

20  portable WiFi hot spot.

21  Q.   Okay.  And the portable WiFi hot spot allows you access

22  to the internet without having an account to the internet; is

23  that correct?

24  A.   Correct.

25  Q.   Okay.  And then it indicates different types of lenses,

1    flash, flash triggers, and a large video light and a camera?

2    A.    Yes.

3    Q.    What appears to be a camera?

4    A.    And lenses, yes.

5    Q.    And lenses.  Okay.  And that was on his -- where he

6    labeled "Packing"?

7    A.    All of that was under the title of "Packing."

8    Q.    Okay.  And during the search of his residence, did y'all

9    locate a considerable amount of computer systems, hard drives,

10   loose digital media, and storage devices?

11   A.    Yes.

12   Q.    And those were all sent in for forensic examination?

13   A.    They were.

14   Q.    Some were sent to the HSI Lab in New Orleans?

15   A.    Uh-huh.

16   Q.    And -- is that right?

17   A.    Yes, that's right.

18   Q.    Okay.  And then because of the vast quantity of data and

19   also because of what we'll talk about in a minute, the

20   encryption, some was sent to a special laboratory set up by

21   the Department of Justice; is that correct?

22   A.    That's correct.

23   Q.    Okay.  And the examination of the computers showed that

24   the largest portion of the data was encrypted?

25   A.    That's correct.

1    Q.    Meaning that it could not be accessed without a code or
2    the encryption code?
3    A.    Right.
4    Q.    And the degree of encryption shows that the Defendant is
5    a pretty sophisticated user?
6    A.    Yes.
7    Q.    In fact, he's an IT teacher?
8              MR. KNIZLEY:  I would interject an objection as to
9    leading.  She's let her testify a little bit more than she's
10   allowing her to.  Leading.  I object to leading.
11             THE COURT:  Ma'am, you can't lead.
12             MS. MURPHY:  Thank you.
13             THE COURT:  Okay.
14   BY MS. MURPHY:
15   Q.    And what is his occupation as you know it?
16   A.    He's a technology teacher, teaching computers.
17   Q.    Okay.  And to date, the -- do the labs continue working
18   on getting into or breaking the encryption of this
19   information?
20   A.    They're still working on some of it, the media.
21   Q.    Okay.  But there was some unencrypted data?
22   A.    There was.
23   Q.    And what did that show?
24   A.    There were thumbnails of the child pornography and
25   children in various stages of undress and provocative posing.

1  Q.   Okay.  And when you say "children," they were primarily

2  Thai boys?

3  A.   Yes.

4  Q.   Now, this case involves a continuing investigation?

5  A.   It does.

6  Q.   In the e-mails between the Defendant and others, he had

7  other conversations that involved conversations about

8  commercial sex acts with children?

9  A.   Yes, while he was in Thailand.

10  Q.   Okay.  And that's the part of the investigation that's

11  continuing?

12  A.   It is with -- yes, with those individuals.

13  Q.   Okay.  Now, directing your attention to a Google document

14  dated June 5th of 2014, which is, I believe, paragraph 26 of

15  your affidavit?

16  A.   Uh-huh.

17  Q.   Okay.  That was a document that was in the

18  "KHUNBUD.Drive.Content"?

19  A.   Yes, from his Gmail account.

20  Q.   Okay.  And it was found in a section called "Photo Sets"?

21  A.   Yes.  That was the title of the document.

22  Q.   And what does he put down for the photo sets?

23  A.   It appears to be poses, "shirt tail in mouth, u-wear

24  tugged down."

25  Q.   What do you believe "u-wear" to be?

1    A.    Underwear.

2    Q.    Okay.

3    A.    "Peeks with speedo pulled down/away, gimme a 'W', pillw,

4    grasping ankles, spread."

5    Q.    There's one towards the end that says "fcdown."  Do you

6    have an opinion as to what that means?

7    A.    Face down, and "fcdown like hogtied, hands holding

8    ankles."

9    Q.    Okay.  So at this point, you have information of the

10   Defendant packing a great deal of photography equipment --

11   A.    Yes.

12   Q.    -- is that correct?  And also one document involving what

13   appears to be requested poses?

14   A.    Yes.

15   Q.    Okay.  Now, was he trading images in the e-mails that you

16   found?

17   A.    (No audible response.)

18   Q.    Or sending --

19   A.    He was sending.

20   Q.    Okay.  Directing your attention to paragraph 30 of your

21   affidavit, there he's sending -- the Defendant, Mr. Evers, is

22   sending an e-mail to a person identified in the affidavit as

23   B.D.?

24   A.    Yes.

25   Q.    And he says, "Thanks for the pics, very much my style"?

1  A.   Yes.

2  Q.   Okay.  And then directing your attention to paragraph 31,

3  what does Evers reply?

4  A.   (No audible response.)

5  Q.   Or I'm sorry, B.D. reply?

6  A.   That the next time, he's going to take a camera with him

7  so that he can return the favor to send him pictures.

8  Q.   Okay.  And he thanks him again for the --

9  A.   For the pictures that he sent before that we just talked

10  about.

11  Q.   Okay.  Now, turning your attention to another Google --

12  or Gmail that was recovered in paragraph 45, identified in 45,

13  page 17, could you read that e-mail, please?

14  A.   "To top it all off, found that number 28, whom I've been

15  grooming for several nights now, is a non-smoker."

16  Q.   Okay.  Let me interrupt you there.  Based on your

17  investigation, do you have an opinion as to what "non-smoker"

18  refers to?

19  A.   Oral sex, a blow job.

20  Q.   "Smoker" refers to -- and "smoking" refers to oral sex?

21  A.   Yes.

22  Q.   Okay.  If you can continue.

23  A.   "It used to be no one wanted you to take pictures, but

24  they all smoked.  That seems to have undergone a 180.  Pics

25  never a problem, smoking hard to come by, so to speak."

1  Q.   Okay.  In addition, did you develop information that the

2  Defendant sent a password-protected disk to one of the people

3  involved in the sexually exploitative conversations that he

4  had over the e-mail?

5  A.   Yes.

6  Q.   And what was that?

7  A.   They spoke in the -- he spoke in the e-mail about

8  referring to it as being Thai cartoons.  And the individual he

9  sent the e-mail to was worried about the police showing up and

10  knocking on the door.  And Mr. Evers advised the recipient

11  that if he -- if you just put the disk in, you know, nothing

12  would happen and to say, oh, well, I put it in the computer

13  and nothing happened, because it was an encrypted disk; you

14  had to have a password.

15  Q.   To see anything on there?

16  A.   Yes.  And Mr. Evers also told the individual where to

17  save what was on that disk on his own computer.

18  Q.   Where it was not easy to recover?

19  A.   Yes.

20  Q.   And did you develop any other information about the

21  Defendant using a similar sort of ghost-type images that

22  wouldn't show up without the appropriate password when

23  crossing the borders into the United States?

24  A.   Yes.

25  Q.   What did you learn?

1    A.   On a blog, people were asking questions about how to

2    circumvent security coming across the border and the airports

3    coming through Customs.  And he advised different, different

4    methods, different programs, different ways of getting it

5    through.

6    Q.   Okay.  Which included this sophisticated level of

7    encryption that even if you opened the computer for the

8    Customs officer with a password, it still wouldn't show up

9    unless you used the secret password?

10   A.   Correct.

11   Q.   All right.  Directing your attention to paragraph 32 on

12   page 12, this is, again, an e-mail between Evers and B.D.

13   dated January 14th, 2005?

14   A.   Yes.

15   Q.   And he's talking about another person named David?

16   A.   Yes.

17   Q.   Okay.  Could you read the one, two -- the sentence that

18   starts on the third line, "He's ver happy"?

19   A.   "He's ver -- or very happy since one of his targets

20   finally showed up at the appointed hour and was fully prepared

21   to deliver as promised."

22   Q.   All right.  And then directing your attention to

23   paragraph 40 on page 14, he again is -- this is July 4th,

24   2006, and he's again sending an e-mail to B.D.?

25   A.   Yes.

1  Q.   Okay.  And starting with the second paragraph, could you

2  start reading that for us?

3  A.   "Well, for starters, back in BKK," which Bangkok, "I

4  returned the K-Why message --" oh, "I returned the K-Why

5  massage place just down from BKK and sought my little masseur

6  from several weeks ago.  We had a pretty good time then, and I

7  was looking forward to a replay."

8  Q.   And then the name of another victim is redacted?

9  A.   "That individual spotted me before I spotted him, and we

10  sat down and did as much small talk as possible under the

11  circumstances.  He was eager for another session, probably

12  because the fee is 1,500, which includes everything, but I

13  always tip 1,000 on top, assuming the service is high

14  quality."

15  Q.   Okay.  And the next paragraph?

16  A.   "I made it clear that I wanted sex, and the individual

17  said 'no problem,' so off we went to the shower (a delight in

18  itself) and on to a room.  After about a half hour massage

19  that was just right, the individual rolled me over and, to be

20  blunt, went to work like I have never experienced before.  We

21  had plenty of time (I went for a two-hour session) and so the

22  pacing was exquisitely slow and delightful.  After a nice,

23  long handjob, followed by an equally ghrough blow job, the

24  individual proceeded to lube both of us up and sit down.

25  There was a bit of oompf-ing and grunting and he got seated,

1    and no small wonder, since Khun individual was an extremely

2    tight fit."

3         And I don't -- in the beginning, I said "BKK" is Bangkok.

4    I believe that's one of the bars that's in Thailand.

5    Q.   Okay.  All right.  And the remainder of that e-mail goes

6    on for three paragraphs, describing the sex session with the

7    boy; is that correct?

8    A.   Yes.

9    Q.   All right, ma'am.  Now, if we could please discuss the

10   risk of flight of Mr. Evers.  During the search of his house,

11   did you locate several different items which gave you concern

12   about his ability to flee?

13   A.   We did.

14   Q.   Show you -- directing your attention to Government's

15   Exhibit B, do you recognize that?

16   A.   I do.

17   Q.   And what is it?

18   A.   It's -- it appears to be a set of DEA credentials, just

19   the part with the photo and the part that says the agency

20   without the badge.

21   Q.   Okay.  And does it appear to have been modified in some

22   way?

23   A.   It looks like a typewriter typed on it.

24   Q.   And whose picture has been added to it?

25   A.   Mr. Evers's.

1    Q.    And now, when you -- HSI tries to prevent someone from

2    leaving the country, how is that normally accomplished?

3    A.    We can put notification in the Customs system, and we can

4    also notify the Department of State about his passport.

5    Q.    Okay.  And what is -- do you believe that that would be

6    effective in this case in preventing the Defendant from

7    fleeing the country?

8    A.    I do not because we --

9    Q.    Why not?

10   A.    In looking through his -- the Gmail account, the same --

11   under the same heading "Drive Content," there was a fake

12   passport that had his picture on it, his address, a different

13   name, and a different passport number.

14   Q.    And so would your notice to keep him from flying out of

15   the country be effective for someone who had the knowledge to

16   create a fake passport?

17   A.    I don't believe so.

18   Q.    In addition to flying out with a fake passport, could he

19   leave through the borders?

20   A.    Yes, across a land border.

21   Q.    Okay.  And is he able to sustain himself in a foreign

22   country such as Thailand?

23   A.    Yes.

24   Q.    Does he speak Thai?

25   A.    He does.

1    Q.    In fact, in his e-mails that you've read, does he make
2    note that he has lots of friends in Thailand?
3    A.    He does.
4    Q.    And you previously testified that he has a foreign bank
5    account?
6    A.    Correct.
7    Q.    One that you know of?
8    A.    Yes.
9    Q.    And your -- the bank records that you got, was it from
10   the Bank of Evergreen?
11   A.    It was.
12   Q.    Showed that he had been transferring large amounts of
13   money to the overseas bank account; is that correct?
14   A.    Yes.  And he would -- the pattern was he would transfer
15   it -- begin transferring it not too long before he would leave
16   to go on a trip.
17   Q.    And have you developed information about whether he has a
18   place to live in Thailand?
19   A.    Yes.
20   Q.    And what does he have?
21   A.    Through e-mails, he is building a house for himself and
22   another family.
23   Q.    With children?
24   A.    Yes.
25   Q.    And has he previously been employed in Thailand?

1    A.    I believe so, as a teacher.

2    Q.    As a teacher, teaching English?

3    A.    English.

4    Q.    All right.  Now, if we could discuss the danger to the

5    community.  Tell us about, without identifying them, whether

6    there's been -- well, whether, first of all, you believe that

7    the victims are in danger in this case, or could be.

8    A.    I possibly do.  There was a victim in Thailand who was

9    afraid to come forward because he wasn't in jail yet.  And if

10   that's --

11   Q.    Because the Defendant had not -- was not in jail?

12   A.    Correct.  And if that's the case here, if there are any

13   locally or within the State, the situation may be the same.

14   Q.    All right.  And on the issue of corruption, was there

15   another victim whose family received a large amount of money?

16   A.    Yes, from wire transfer from -- in the bank account that

17   we did the search warrant on, there were wire transfers to an

18   individual who was a lady in Thailand that our agents out of

19   the attache office went and interviewed her.  And she had a --

20   there was a small boy there we believe to be her grandson, and

21   he wouldn't talk to investigators.

22   Q.    Okay.  And approximately how much money did she receive,

23   do you recall?

24   A.    Right off, I don't.  It was a substantial amount.

25   Q.    Does the figure 30,000 sound familiar or not?

1  A.   Yes.

2  Q.   And through the information that you've developed, you've

3  also learned that the Defendant was monitoring law enforcement

4  actions in Thailand; was he not?

5  A.   Yes.

6  Q.   Directing your attention specifically to paragraph 51 on

7  page 19 of your affidavit, about halfway down where he says

8  that he went down to our fave hole, do you see that?

9  A.   Yes.

10 Q.   Okay.  Could you read what follows?

11 A.   "Nobody but mamasan there."

12 Q.   And what is a mamasan, in your experience?

13 A.   Someone who may run an establishment or run a bar.

14 Q.   A woman usually, momma?

15 A.   Yes.

16 Q.   Okay.  Go ahead.

17 A.   "Dead.  I took the opportunity to chat some and try to

18 suss out the situation.  Biet (mamasan) reckons that the furor

19 will blow over in the next two to three weeks (in time for

20 your arrival, arsehole) and has been initiated by some higher

21 ups who are just trying to make a show.  Take that for what

22 it's worth, I suppose.  Also, the one we both recognized from

23 the news is working with constabulary, as is --" and then --

24 Q.   The name of another victim?

25 A.   The name is redacted.

1   Q.   Okay.

2   A.   "(Long haired, then short) --"

3   Q.   Another name?

4   A.   " -- who was bubbly and quirky in a nice way, now dull

5   and slow-witted.  Shame.  Biet recalls others who are around,

6   but due to the late hour were absent."

7   Q.   That's fine on that issue.  Now, as part of your

8   investigation, you've learned that the Defendant has no

9   children of his own and has never been married; is that

10  correct?

11  A.   Yes.

12  Q.   And he worked at a -- or is still employed at a school?

13  A.   Uh-huh, yes.

14  Q.   And what was his employment, did you say?

15  A.   A computer -- a technology instructor.

16  Q.   And from the forensic examinations and the roadblocks

17  that have come up there, you've learned that the Defendant is

18  a sophisticated user of data devices?

19  A.   Yes.

20  Q.   Okay.

21           MR. KNIZLEY:  Your Honor, I would ask she please

22  just not lead.  I object to leading.

23           MS. MURPHY:  I apologize.  She's testified to that.

24  I'm just leading her to the next point.

25  BY MS. MURPHY:

1    Q.    Okay.  If restrictions are placed on the Defendant for

2    internet usage, do you believe they would be successful?

3    A.    I don't believe so.

4    Q.    Okay.  Are there other means of accessing the internet

5    without having an account?

6    A.    There is.  And because of his vast knowledge of computers

7    and the way they work and the internet and the web and

8    everything, I believe that he'd be able to access it

9    regardless.

10   Q.    Are people able to access and open a WiFi connection of

11   their neighbors?

12   A.    Yes.

13   Q.    Are people able to get hot spots?  In fact, he referenced

14   a hot spot, did he not?

15   A.    Yes.  Hot spots or a cell phone from Wal-Mart or the

16   neighbor --

17   Q.    That has data --

18   A.    -- the McDonald's, a library.

19   Q.    When someone buys a telephone from Wal-Mart, is there a

20   law enforcement name for those?

21   A.    A burner phone.

22   Q.    Because can you trace those?

23   A.    They can be -- or a throw-away phone.  They can't be

24   traced, and they are so easily accessible and they're not real

25   expensive.

Q.   Okay.  And ma'am, his computers, the ones he had at the time, were seized during the search in April of 2015; is that correct?

A.   Yes.

Q.   And have you developed other information about his current computers?

A.   That two or three days after the search warrant, he had purchased more computers.

Q.   And directing your attention to paragraph 34, directing your attention to an e-mail dated March 30 of 2015 that Mr. Evers wrote to B.D., what did he say that he was going to be doing?

A.   It was May 30 of 2005.

Q.   Pardon me.  What did he say he was going to be doing?

A.   "Helping run a two-night camp for some of the local lads, hosted by the local Rotary Club."

Q.   Okay.  And then you found an e-mail dated three days later?

A.   Yes, about the campout being canceled.

Q.   And what did he say?  Could you read that?

A.   "Alas, no pictures of lads capering about.  No overly thorough applications of sunscreen.  No tick inspections.  No foreskin/zipper disentanglements.  So remind me to take the SPF-45, tweezers, and a zipper with me to Thailand so I can recreate What Would Have Been."

1   Q.   And at this time, the local sheriff has put out a plea to

2   anyone who has information that other children may have been

3   violated to come forward?

4   A.   Yes.

5   Q.   Okay.  In addition, do you have information -- well, let

6   me direct you to paragraph 59.  And this was the e-mail that

7   he responded to D.L.?

8   A.   Yes.

9   Q.   On December 12th of 2011?

10  A.   Yes.

11  Q.   And what did he say?

12  A.   From the beginning?

13  Q.   Well, he -- start with, in general, it was about he

14  described his interest in photographing and children at his

15  school?  Just read it from the beginning.

16  A.   "It's so good to hear from you.  I like to think of

17  myself as a positive person, but when you and I go so long

18  without contact, my mind drifts to the dire side of

19  possibilities.  Glad to know it's nothing more than mid-winter

20  doldrums.  As for me, all the years I've been teaching, I've

21  never had anything even remotely 'tempting.'  Until this year.

22  This year has brought a couple of ninth graders that are very

23  intriguing.  One is very much a puppy -- comes tumbling in at

24  break every day to give me an update on his life and pester me

25  with bizarre questions.  Just turned 15, but looks all of 12,

1  especially when standing next to the KHON DAAM that comprise

2  98 percent of our student body.  The other is a tall, very

3  dark-skinned (but Caucasian) broody thing whom I've yet to

4  chat with but is very *easy* on the eyes.  Discretion is, of

5  course, the word of the day, but it's always nice to have

6  something brighten one's day.  I'm awaiting the right time to

7  grab a couple of pix (big surprise, huh?).  In the meantime,

8  I'm enjoying the wind-down to Christmas break (7 school days

9  to go.)"

10  Q.   And again, the sheriff is conducting an investigation to

11  see if any of the school students have been molested?

12  A.   He is.

13  Q.   And did you also learn that at least in 2000, the

14  Defendant was a Boy Scout den leader?

15  A.   I believe -- yes.

16  Q.   But then he didn't have any children in the Boy Scouts?

17  A.   No.

18          MS. MURPHY:  Thank you.  No further questions.

19                     CROSS EXAMINATION

20  BY MR. KNIZLEY:

21  Q.   Agent Whitehead, if I may start where you remarked that

22  once that Mr. Evers's computers were seized by law

23  enforcement, that two or three days later, he had replaced the

24  computers?

25  A.   Yes.

1  Q.   And did law enforcement become aware of that at the time

2  he made the replacements?

3  A.   Shortly thereafter.

4  Q.   How long?

5  A.   It was through e-mails.  It was a couple of days.

6  Q.   Y'all were monitoring his e-mails?

7  A.   No.

8  Q.   You said through e-mails.  How did you find that out?

9  A.   When we issued the subpoena for the e-mail accounts --

10  Q.   Uh-huh.

11  A.   -- by the -- we put the date -- I don't recall what they

12  are, but we put the dates in there of the time span we were

13  looking for.

14  Q.   Uh-huh.

15  A.   And when they sent the information back, some of the

16  e-mails showed that he had ordered computers.

17  Q.   The e-mail shows he ordered computers?

18  A.   Yes.

19  Q.   I may be confused about that.

20  A.   The e-mails show that he had ordered computers.

21  Q.   And it took a great deal of time before the subpoenas got

22  responded to; did it not?

23  A.   Yes, it did.

24  Q.   And so it wasn't just a few days later; it was some

25  several months later or what?

1   A.    Looking at the dates on the -- when the e-mails were sent

2   and received.

3   Q.    Okay.  And you started your testimony with some

4   information in connection with the sex trade in Thailand and

5   gave the Court a good bit of information regarding that sex

6   trade.  What has been the source of your training or expertise

7   to gain that information or knowledge of the behavior of

8   people in Thailand in connection with minors and sex trade?

9   A.    Documentation that's been published by the State

10  Department.  The -- I believe the CIA has also published

11  documentation.

12  Q.    Okay.  Other than this documentation, is it the

13  documentation you referred to in your affidavit?

14  A.    Yes.

15  Q.    Other documentation other than what you referred to in

16  your affidavit?

17  A.    From other agents that are very familiar -- more familiar

18  than I am with the sex trade in Southeast Asia.

19  Q.    Okay.  First as to your knowledge of it, you gained your

20  knowledge by reviewing some documentation that's been

21  published by some governmental agency?

22  A.    Yes.

23  Q.    So not by your -- you don't have an expertise in that

24  area; you just happened because you were assigned this case to

25  become more familiar with some governmental publication;

1  right?

2  A.   Yes.

3  Q.   And other than that, you don't have any more particular

4  expertise in the Thailand sex trade?

5  A.   I don't.

6  Q.   And anyone else could have read that just as you did; is

7  that correct?

8  A.   Yes.

9  Q.   It's a public document?

10  A.   Yes.

11  Q.   Okay.  Now, you talked about there being the sending of

12  money and the -- excuse me, said he was going to buy a house

13  over there?  Where did you gain that information?

14  A.   There is an e-mail communication with Facebook where he's

15  trying to have his account reinstated.  And he explains in the

16  e-mail that he's building a house with a family over in

17  Thailand, and that's what the e-mail communication was about.

18  Q.   I understood you to say he was buying a house over there.

19  Am I incorrect about that?

20  A.   I don't recall if it's buying or building.

21  Q.   In fact, did your investigation reveal he was, in fact,

22  helping a family build a house over there?  Do you have any

23  information he has any real property ownership in that

24  country?

25  A.   No.

1    Q.    Do you have any information he owns any house in the

2    country?

3    A.    No.

4    Q.    Did you gain information through your investigation that

5    he was, in fact, assisting a family to build a house there?

6    A.    I don't recall what the e-mail says.

7    Q.    Okay.  And I'm not talking about e-mails.  I'm talking

8    about on-the-ground investigation with agents speaking with

9    people in Thailand.

10   A.    No.

11   Q.    Do you have any information about that?

12   A.    Not him building or buying a house.

13   Q.    Okay.  Do you have information -- you went and determined

14   the -- that he was sending money to a particular account for a

15   particular family in Thailand; is that right?

16   A.    Yes.

17   Q.    And did you -- were you or someone in law enforcement

18   able to identify the owner of that account?

19   A.    Yes.

20   Q.    And did -- after identifying the owner of that account,

21   did someone either from our Government or the Thailand

22   government law enforcement go interview those people?

23   A.    They did.

24   Q.    And was it our Government or Thailand government?

25   A.    It was our Government with individuals assigned to our

1    attache office.

2    Q.    And what agency was it?

3          (No audible response.)

4    Q.    What agency was it?

5    A.    Homeland Security.

6    Q.    Okay.  And Homeland Security then would have went from

7    the Bangkok office --

8    A.    Yes.

9    Q.    -- out to wherever this location was?

10   A.    Yes.

11   Q.    And did you receive a report back and review the report

12   of whoever interviewed those people?

13   A.    I don't recall if I received a report -- a physical

14   report.  I know that he called me and told me about it on the

15   phone.

16   Q.    Who was "he"?

17   A.    The agent in Bangkok.

18   Q.    And did he tell you that these were the people that were

19   receiving the money were the people that Mr. Evers had been

20   staying with since 2008 when he went over there?

21   A.    He didn't say that.

22   Q.    Well, did you gather that information from any source?

23   A.    They knew him.

24   Q.    Okay.  You determined from the agent who went out -- did

25   the agent speak Thai?

1  A.  He had a Thai speaker with him.

2  Q.  Did the agent speak Thai?

3  A.  No.

4  Q.  So he had another person, a law enforcement officer

5  there.  Was this one that had a question about corruption or

6  was this a straight --

7  A.  No.

8  Q.  Okay.  How do you know that?

9  A.  Well --

10 Q.  You don't.  You don't.

11 A.  I don't.

12 Q.  All right.  Okay.  So we have a law enforcement over

13 there that speaks Thai who went and talked to some Thai people

14 that he had sent money to; right?

15 A.  Yes.

16 Q.  That's your understanding.  If I say the wrong, please

17 stop me and correct me.

18 A.  Yes.

19 Q.  Okay.  And that agent, if you know, tells him what the

20 people told him?

21 A.  Right.

22 Q.  And then the agent tells you what the police officer said

23 that the people told him?

24 A.  Yes.

25 Q.  And you don't know whether or not these are the same

1   people that he's been living with when he goes over there

2   since 2008, do you?

3   A.   I don't know that.

4   Q.   Do you know whether or not the youngest member of that

5   immediate family is 22 years old?

6   A.   I didn't know that.

7   Q.   Well, do you know whether or not that grandchild that was

8   referred to lives in the home or does not live in the home?

9   A.   I was under the impression they lived in the home.

10   Q.   And you got that impression from speaking with the agent

11   who had spoken with the officer who spoke with the family?

12   A.   Yes.

13   Q.   What did the agent say that gave you that impression, if

14   you recall?

15   A.   That it was an older lady, the child appeared to be her

16   grandson, and that they tried to talk to him, and he wouldn't

17   talk to them.

18   Q.   What about that tells you the child lives in the home?

19   A.   (No audible response.)

20   Q.   Nothing?

21   A.   I don't know.

22   Q.   Okay.  You don't have ready information to give to the

23   Court that the money that he was sending to this family was a

24   family where anyone who had a minor child in the home, do you?

25   A.   No.

1  Q.   And you don't have any information to know whether or not
2  when we talk about him having a home there and when you talk
3  about the e-mail that said he was building a home there or
4  helping a family build a home whether that is, in fact, the
5  same family and the same money?
6  A.   I don't know.
7  Q.   So you've almost suggested a bit that he was sending
8  money for -- to a family for participation in sex, but we
9  don't have any information about that, do we?
10 A.   No.
11 Q.   And that would be simple speculation?
12 A.   I guess.
13 Q.   And if we had interviewed this family a little bit
14 further, we may have been able to determine whether or not Bud
15 was a resident and lived with them when he went over there in
16 the summers for the last seven years?
17 A.   (No audible response.)
18 Q.   We don't have the benefit of that, do we?
19 A.   No.
20 Q.   Okay.  Now, you reviewed a number of e-mails and some
21 other information, but as far as any allegation of actual --
22 you read some e-mails that spoke of sexual contact with
23 individuals; is that correct?
24 A.   Yes.
25 Q.   But as far as any information from any individual that

1    alleged any sexual contact by Mr. Evers, that came from the
2    one person that came forward in 2014; is that right?
3    A.   Yes.
4    Q.   And in your affidavit, we don't -- we characterize the
5    person as a minor; right?
6    A.   Yes.
7    Q.   And we say he had sex; is that correct?
8    A.   Yes.
9    Q.   Do we have any more details of what the allegation of the
10   conduct was that the person that was described as a minor says
11   is sex?  Do we have any more details than that?
12   A.   In the forensic interview that was done, they -- he
13   described it.
14   Q.   What did he say?
15   A.   He described a blow job.  I don't -- I don't recall what
16   all it is.  I haven't reviewed the transcript.
17   Q.   Okay.  To the best of your recollection, a blow job is
18   one thing; is that right?
19   A.   Yes.
20   Q.   All right.  Now, and this person was -- from that person,
21   then the agency began to try to determine what -- somehow
22   focused on Mr. Evers; is that right?
23   A.   Yes.
24   Q.   And then do you know anything about the lineup or the
25   identification process by which Mr. Evers was identified?

1  A.   The agent in Bangkok, our agent in Bangkok asked me if I

2  would do a six-pack, which is a photo lineup.

3  Q.   Yes.

4  A.   And I prepared that for him, and I sent it to him.

5  Q.   And you had a photospread prepared?

6  A.   Yes.

7  Q.   And you have that, I suppose, still?

8  A.   Yes.

9  Q.   Okay.  And do you know what happened when you sent the

10 photospread over there when the investigation was done?

11 A.   Right when I sent it over there, I don't.  I do know that

12 during the forensic interview, the forensic interviewer

13 brought it out and asked the individual if anyone looked

14 familiar on the lineup.

15 Q.   All right.  The photospread was presented by a forensic

16 interviewer?

17 A.   Yes.

18 Q.   Social worker?

19 A.   I don't know if that's what she is.  I just know her as a

20 forensic interviewer.

21 Q.   Do you know whether he has any law enforcement

22 experience?

23 A.   I don't know.

24 Q.   Do you -- you're familiar with the manner in which a

25 photospread should be presented to an individual to ensure

1  there's no mistake or suggestion; is that right?

2  A.   Yes.

3  Q.   And that's a process for which you've been trained to do?

4  A.   Yes.

5  Q.   And it's not something that anyone should be able to do

6  without that training; is that right?

7  A.   It's showing somebody a lineup and saying, "Do you

8  recognize anybody in the picture."

9  Q.   So you're saying you have no more expertise in presenting

10  a six-pack than anyone without law enforcement training?

11  A.   I don't.

12  Q.   Okay.  There are -- were any risk of suggestion when

13  you're presenting a photospread in order to make an

14  identification of a suspect?

15  A.   Yes.

16  Q.   And do you have training that helps you to prevent that

17  misidentification to take place because of the suggestion?

18  A.   I don't know necessarily that I call it training; more or

19  less just common sense.

20  Q.   You wouldn't call it training.  And have you had any

21  training in that respect?  Just yes or no.

22  A.   No.

23  Q.   Okay.  So you've had no training in identification of --

24  in presenting a photospread identification?

25  A.   No.

1  Q.   Okay.  Now, and do you know how, of course, you would

2  know how the forensic examiner presented this photospread,

3  would you?

4  A.   It's on video from the forensic interview.

5  Q.   Do you have that?  Not here, but do you have that?

6  A.   I do.

7  Q.   Okay.  And do you have any other video of the interview

8  of the alleged victim?

9  A.   The whole interview from the time he walked into the room

10 until he got up and walked out.

11 Q.   Do you have more than one video of him, if you know?

12 A.   No.

13 Q.   We spoke of a number of e-mails, and I'll direct your

14 attention to paragraph 30 and 31 of your affidavit.

15 A.   Yes.

16 Q.   Paragraph 30 is -- you were making reference to an e-mail

17 communication with someone approximately a little over

18 11 years ago?

19 A.   Yes.

20 Q.   And even in the 11-year-old e-mail, there's nothing in

21 that e-mail that says these people were nude or it's child

22 pornography or anything of that nature; is that right?

23 A.   That's right.

24 Q.   And so what you have is an 11-year-old e-mail of someone

25 who sent a picture to another person?

1  A.   Yes.

2  Q.   And matter of fact, it makes no reference to minority or

3  anything that may suggest minority, does it?

4  A.    It just says "maybe half aboriginal equal sign Thai or

5  Asian."

6  Q.   Does that suggest to you minority or not minority?

7  A.   Or I guess you could say it's ethnicity.

8  Q.   I know, but I'm asking you about minority.  Excuse me.

9  Minority in age, not minority in race.  I'm sorry.

10 A.   No.

11 Q.   And that's what we're here about is minors and

12 photographing minors; right?  There's nothing there to suggest

13 this is child pornography, is there?

14 A.   Right.  No, there's not.

15 Q.   All right.  And you mentioned on paragraph 45 when the

16 prosecutor was asking you and we made the reference to

17 smokers, and you say that you understand the smoker had some

18 association with oral sex or not oral sex.  Did you gather --

19 is that in the Thailand community you understand or what?

20 A.   Yes, Thai slang.

21 Q.   Okay.  And did you gather that from the reference

22 material you were looking at or some other source?

23 A.   Just open source on the internet.

24 Q.   Open source on the internet.  You Googled it?

25 A.   Yes.

1    Q.    That's how you came up with that?

2    A.    Yes.

3    Q.    Okay.  And other than Googling it, did you have any other

4    way to determine that may have been what that was

5    characterizing?

6    A.    I didn't.

7    Q.    And you were referring to an e-mail that took place in

8    June of 2008, about seven-and-a-half years ago?

9    A.    Yes.

10   Q.    And ma'am, I did not get the number of the paragraph when

11   you talked about the cartoon that may have been suggesting a

12   video.  Do you remember what --

13   A.    It -- I don't believe it's in the affidavit.

14   Q.    I'm sorry.  And that was -- it's not in the affidavit.  I

15   didn't hear the paragraph.  Is the same thing about the blog

16   not in the affidavit?  You mentioned a blog earlier --

17   A.    Yes.  It's not in the affidavit either.

18   Q.    And do you have that material in your possession, the

19   blog and the cartoon or the e-mail that refers to that?

20   A.    Yes.

21   Q.    And it was just one that in this particular case, you had

22   enough in the affidavit, you didn't feel necessary to put that

23   in?

24   A.    Yes.

25   Q.    Okay.  And you mentioned paragraph 32.  And it's talking

1    about an e-mail from Mr. Evers to someone else about what yet

2    a third party did; is that right?

3    A.    Yes.

4    Q.    It has nothing to do with what Mr. Evers did or what the

5    person he's e-mailing did; is that right?

6    A.    (No audible response.)

7    Q.    It's talking about what a third party named David did --

8    A.    Yes.

9    Q.    -- is that correct?

10   A.    That's correct.

11   Q.    And this e-mail is 11 years old, a little over 11 years

12   old; is that right?

13   A.    Yes.

14   Q.    Now, you've talked about flight a little bit.  And you

15   said the DEA identification was in some way concerning to you

16   that may be some basis that would say that he could be able to

17   fool Homeland Security individuals at border points to get out

18   of the country.  Is that the suggestion?

19   A.    Possibly.

20   Q.    How about probably?

21   A.    (No audible response.)

22   Q.    No?

23   A.    No, not with that.

24   Q.    Do you have it with you, by any chance?

25   A.    I do not.  All we have is the copy.

1    Q.   It's a very cheaply made representation of an

2    identification, isn't it?

3    A.   But it looks obviously fake.

4    Q.   And would it be something that may have been able to be

5    used if you were going to a masquerade party or a party that

6    you were going to impersonate somebody?  Would that be

7    appropriate -- would what you saw there be appropriate for

8    that?

9    A.   I wouldn't say that.

10   Q.   Well, if that was the character you were going to go as,

11   the masqueraded character --

12   A.   I still wouldn't do it.

13   Q.   Is it that bad, or is the ID that bad, look that bad?

14   A.   I wouldn't do it because I'd be afraid somebody would say

15   you're impersonating an officer, poorly but --

16   Q.   Okay.  It's not something that's going to trick the

17   agents at the border, is it?

18   A.   I don't believe so.

19   Q.   Okay.  So that's really -- that in and of itself is not

20   something you should be concerned about being a flight risk;

21   right?

22   A.   I don't believe so.

23   Q.   And you -- this is a black and white picture, but you

24   looked at the picture of him there, and he looks a little

25   different in that picture than he does today; right?

1    A.    Yes.

2    Q.    About, I think, if he were maybe 10, 15 years earlier?

3    A.    Younger.

4    Q.    Younger.  So this is something old that you found at the

5    house that looked to be a cheap whatever -- for whatever

6    purpose it was made, cheaply and poorly done?

7    A.    Yes.

8    Q.    And not going to trick a border agent?

9    A.    No.

10   Q.    Now, the passport you spoke of, the fake passport, do you

11   have that with you here today?

12   A.    I don't.  We were trying to get a copy of it.  It was a

13   digital copy that was on the drive content from the Google

14   account.

15   Q.    It wasn't a physical reproduction of a passport like you

16   found at his house; is that right?

17   A.    No.

18   Q.    And it was something that was a picture of a passport but

19   not, to your knowledge, ever produced or anything else like

20   that?

21   A.    Not that we found.

22   Q.    Okay.  And did you have the -- how old that was, by any

23   chance?

24   A.    No.

25   Q.    Was it back in the same timeframe, the 10, 12 years ago

1    that some of this other stuff is, or do you have any idea?

2    A.    I don't recall.

3    Q.    Was it something that you think was going to fool the

4    border agents too?

5    A.    If it was in a real passport, it looked identical to his

6    valid passport.  Just the name was different and the number

7    was off.

8    Q.    Right.  But you're just looking at a digital image; are

9    you not?

10   A.    Yes.

11   Q.    I mean, but passports have other characteristics other

12   than the appearance, do they not, that make them special?

13   A.    Yes.

14   Q.    And you're going to have to replicate all of that, are

15   you not, in order to deceive someone, a Customs agent; are you

16   not?

17   A.    Yes.

18   Q.    And you don't have anything to suggest that what he --

19   you found on the internet would have the ability to deceive an

20   agent, do you, from just what you found on the internet?

21   A.    From his account?

22   Q.    Yeah.

23   A.    No.

24   Q.    Okay.

25              THE COURT:  Tell me more about the passport picture.

1    Was it an actual passport?

2            THE WITNESS:  It looks just like the color page, the

3    picture.

4            THE COURT:  It was in color?

5            THE WITNESS:  It was all in color.

6            THE COURT:  Uh-huh.

7            THE WITNESS:  You couldn't see the watermarks or the

8    holograms or anything like that on it, but it looked like

9    somebody had scanned their passport.

10           THE COURT:  And it was his picture on it?

11           THE WITNESS:  Yes, ma'am.

12           THE COURT:  And a different passport number?

13           THE WITNESS:  Yes, ma'am.  And a different name.

14           THE COURT:  A different name and number.  Okay.  I'm

15    sorry, Mr. Knizley.

16           MR. KNIZLEY:  Yes, ma'am.

17    BY MR. KNIZLEY:

18    Q.   And you don't know the vintage of that production, when

19    that production was made?

20    A.   I don't.

21    Q.   Okay.  Now, you also, when you were concerned about the

22    flights, that he had a place to live over there.  We're

23    talking about the very same place, are we not, that the agents

24    visited; is that correct?

25    A.   If that's where he had been staying, I guess.  I don't

1    know.

2    Q.    Well, you're the one that testified he had a place to

3    live over there.  What were you referring to?

4    A.    The long-term rental or the house that we were under the

5    impression he was building or buying.

6    Q.    And did you do any investigation to determine whether

7    that house is the very house that your agent went to?  Did

8    anybody ever ask that question?

9    A.    No.

10   Q.    And a long-term rental, I mean, that's just a place to

11   rent.  I mean, anybody can tell a long-term rental; right?

12   A.    Yes.

13   Q.    There's nothing unique about that to Mr. Evers, is there?

14   A.    No.

15   Q.    So that's really not a consideration the Court should

16   consider as to him having a locality to be at if he went to

17   Thailand just because he at one time had a long-term rental,

18   is it?

19   A.    No.  But you can go over there and get a long-term rental

20   and --

21   Q.    Yeah.  But that's not unique to him.  Anybody that can

22   get there can do that; right?

23   A.    Yes.

24   Q.    So it's not unique to him as to his risk of flight.  That

25   would be just anybody; right?

1  A.   Yes.

2  Q.   And you talked about danger to the community, and you

3  said that someone was fearful because he had not been put in

4  jail yet?

5  A.   Yes.

6  Q.   Is that from the forensic interview of the individual you

7  were talking about?

8  A.   No.  That's another individual in Thailand.

9  Q.   Okay.  Has that person came forward?

10  A.   No.  They wouldn't.

11  Q.   Well, is there a suggestion from the individual

12  themselves that Mr. Evers has done something to him?

13  A.   Yes, but he wouldn't talk further.

14  Q.   Well, did he go through the identification process to

15  identify the person?

16  A.   Not that I'm aware of.

17  Q.   Then do you really have very much information that

18  associates Mr. Evers with this other individual?

19  A.   No.

20  Q.   So we don't really know if this other individual who

21  didn't come forward that really identified Mr. Evers as the

22  potential perpetrator?

23  A.   Nothing was said to me about showing him a lineup.

24  Q.   We don't have any information that connects Mr. Evers to

25  this other individual who won't come forward as Mr. Evers

1    being the potential perpetrator, do we?

2    A.    No.

3    Q.    So that's really not something that we should be worried

4    about about danger to the community; is that right?

5    A.    (No audible response.)

6    Q.    At least that individual, I'm saying, because we don't --

7    we can't associate him with Mr. Evers?

8    A.    Right.

9    Q.    And you said the victim was getting a large amount of

10   cash.  And I think we're -- and when you was on the subject of

11   -- when you were on the subject of danger to the community,

12   you said the victim got a large amount of cash, and we talked

13   about the grand sum of $30,000, but you still don't know

14   whether or not that's the same people he was helping build a

15   house, do you?

16   A.    I don't.

17   Q.    And we don't know if that grandchild lives in the house,

18   do we?

19   A.    No.

20   Q.    And we don't know if the youngest person in that house is

21   22 years of age, do you?

22   A.    No.

23   Q.    And if he was sending the money to the people that have

24   been kind enough to allow him stay for eight years when he

25   goes over there, then there would be nothing sinister about

1    that as to danger to the community, would it?

2    A.    (No audible response.)

3    Q.    As to danger to the community.

4    A.    Here?

5    Q.    No.  Well, yeah, here or there, either one.

6    A.    I can't answer that.

7    Q.    All right.  Now, we talked about danger to this

8    community; right?

9    A.    Yes.

10   Q.    And if Mr. Evers is released, we're concerned about if he

11   stays in the Southern District of Alabama whether his release

12   would create a danger to the community of the people in this

13   District; is that right?

14   A.    Yes.

15   Q.    And the prosecutor said to you that the sheriff on

16   television last night -- I saw it.  Did you see it?

17   A.    Yes.

18   Q.    Okay.  At first, the anchor lady said, Ms. Rose Ann

19   Haven, said that if anybody has been a victim of this man, and

20   his picture was on there, to please come forward; right?

21   A.    I didn't see her say that.

22   Q.    Okay.  Did you see Sheriff Brock say that?

23   A.    Yes.

24   Q.    And he said if anybody had any inappropriate contact;

25   right?

1    A.    Yes.

2    Q.    And nobody has came forward, have they?

3    A.    Not that I'm aware of.

4    Q.    Okay.  Now, let's back up from the announcement last

5    night on television that, to our knowledge, no one has came

6    forward; right?

7    A.    Right.

8    Q.    And you determined that Mr. Evers was a high school

9    teacher; did you not?

10   A.    Yes.

11   Q.    And where did he teach high school?

12   A.    Hillcrest High School in Evergreen.

13   Q.    And what grades did he teach?

14   A.    (No audible response.)

15   Q.    Nine through 12, is that --

16   A.    Nine through 12 high school.

17   Q.    Okay.  And he had interaction with children then of ages

18   14 to 18, whatever ninth graders are?

19   A.    Yeah.

20   Q.    To about --

21   A.    Well, whatever ninth graders are.  My -- I don't have any

22   that old.  14?

23   Q.    Well, I have them that old, but it's been so long ago,

24   I've forgotten.

25   A.    I would think 14 to 17, 18, 19, depending on birth dates.

1    Q.    Okay.  And in that 15 years, did your investigation

2    determine any allegation ever against Mr. Evers or a complaint

3    or anything to any of those children he associated with the

4    last 15 years?

5    A.    No.

6    Q.    And you said he was associated with Boy Scouts as well?

7    A.    Yes.

8    Q.    And do you know how long he was associated with the Boy

9    Scouts?

10   A.    No.  I don't know exactly.

11   Q.    I think in your examination, the prosecutor may have said

12   at least to the year 2000?

13   A.    Yes.

14   Q.    And you agreed to that?

15   A.    Yes.

16   Q.    So do you know that or are you just agreeing to what she

17   said?

18   A.    No.  Since 2000.

19   Q.    Since 2000.

20   A.    Up until 2000.  I don't know how long before that he was

21   involved with Boy Scouts.

22   Q.    And how did you know that?

23   A.    Through pictures that we found, and he was in uniform.

24   Q.    How did you date the pictures?

25   A.    Looking at the dress, the way he was dressed.

1    Q.   And you dated them --

2    A.   The color in his beard.

3    Q.   And you dated the year 2000 from that?

4    A.   No.

5    Q.   What you did was when this -- when Ms. Murphy said up to

6    2000, you just agreed; right?

7    A.   No.

8    Q.   Where did you get the 2000 from then?

9    A.   We had discussed it earlier.

10   Q.   Well, where did you get the 2000 from to testify about

11   it?

12   A.   Ms. Murphy and I had discussed it earlier.

13   Q.   She told you?

14   A.   Yes.

15   Q.   So you didn't -- no independent knowledge of it yourself

16   whatsoever?

17   A.   Not that it -- not that he was working with them up until

18   2000.

19   Q.   Okay.  Whatever timeframe he was with the Boy Scouts, and

20   these are young boys, we're assuming, right, over the age of

21   12?  I think Cub Scouts is the 12 or something.  That age, 12

22   to 18, something like that?

23   A.   Well, I have no idea with Boy Scouts.  I don't know.  I

24   assume.

25   Q.   But he's -- do you know of any complaints whatsoever of

1   anyone ever saying Mr. Evers abused or had any inappropriate

2   contact with any of the Boy Scouts for the timeframe he was

3   associated with them?

4   A.    No.

5   Q.    Do you know that there were law enforcement officers that

6   were also in the same Boy Scout troop he was with?

7   A.    Yes.

8   Q.    Who was that?

9   A.    I don't -- Chuck McMullen -- McMillan.

10  Q.    Lawyers and judges too?

11  A.    I'm not aware of that.

12  Q.    Okay.  But there has been no allegation, to your

13  knowledge, of any misconduct with him in connection with the

14  boys he was constantly around at least up to the year 2000; is

15  that right?

16  A.    Right.

17  Q.    Now, is it your testimony that the Homeland Security or

18  the FBI cannot keep this man off the internet if he's

19  released?

20  A.    That's --

21  Q.    They're not monitored to see whether he's on the

22  internet?

23  A.    That's my understanding.  I don't know about the FBI.

24  Q.    Okay.  And you think a burner phone, if you get a burner

25  phone, and that's how he would get on the internet and get

1   photographs on the burner phone?

2   A.   Yes.

3   Q.   Okay.   The little mic -- tiny photographs, though; right?

4   A.   Yes.

5   Q.   Okay.   And you don't think that if he was placed in,

6   let's say, house arrest and he -- and a requirement was that

7   the Pretrial Services officer comes and inspects the home that

8   we can keep him off the internet?

9   A.   I don't believe so.   He's very intelligent.   He's very

10  smart.

11  Q.   And you say that, and I did hear you say that.   And he's

12  a high school computer teacher; right?

13  A.   Yes.

14  Q.   Other than having -- teaching these classes in high

15  school, do you have some other reason to think he has some

16  particular expertise in the computer field?

17  A.   The way that his computers were encrypted, to me, it

18  would take a very smart, very intelligent person to be able to

19  backdoor and figure stuff like that out.

20  Q.   Okay.   Are you familiar with encryption?

21  A.   Not to that extent.

22  Q.   To any extent?

23  A.   Very, very little.

24  Q.   Okay.   So how do you know what the sophistication is

25  required to have the encryption that you contend was on his

1  computers?

2  A.   Based on how long it's taken our forensics, our computer

3  forensics agents to attempt to crack it.

4  Q.   You don't know how the encryption got on there.  You

5  don't know the extent of the encryption.  You just know it

6  took a long time to get there.  And from that, you conclude he

7  has some particular expertise in computers?

8  A.   I don't know who else would have encrypted them.

9           MR. KNIZLEY:  Thank you.

10          THE COURT:  Any followup, Ms. Murphy?

11          MS. MURPHY:  Briefly, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MS. MURPHY:

14  Q.   Ma'am, about identifying the Defendant as the person that

15  was sexually exploiting children in Thailand, the event where

16  the forensic examiner showed the one victim the photospread,

17  that was videotaped?

18  A.   Yes.

19  Q.   And that videotape will be turned over as part of

20  discovery?

21  A.   Yes.

22  Q.   And if there were any attempts to be suggestive on it,

23  that would show up on the videotape?

24  A.   Yes.

25  Q.   Additionally, that victim also had been communicating

1  with the Defendant through Facebook; is that correct?

2  A.   That's correct.

3  Q.   And the Defendant was also identified through his

4  Facebook usage?

5  A.   The victim sent us pictures that they had had exchanged

6  between them.

7  Q.   And they included pictures of the Defendant?

8  A.   Yes.

9  Q.   Mr. Knizley asked you about e-mails that were exchanged

10  between the Defendant and the person being identified only as

11  B.D.?

12  A.   Right.

13  Q.   And in the e-mails that he selected, there was no

14  identification that what they were talking about in particular

15  was sexual exploitation of children?

16  A.   Right.

17  Q.   Right.  Yet, in another e-mail in paragraph 34 where he's

18  talking about the Rotary Club sleepover that he volunteered

19  for, he's talking about foreskins in the zipper --

20  A.   Yes.

21  Q.   -- of the children; is that correct?

22  A.   Yes.

23  Q.   And then directing your attention to page 40 -- I mean,

24  paragraph 40, sorry, Mr. Knizley asked you whether the term

25  "smoking" or "smoked" was, you know, really about oral sex; is

1    that correct?

2    A.    Yes.

3    Q.    And you explained to him how you developed that

4    information.  Did you also talk to another agent with

5    particular expertise in Southeast Asian trafficking?

6    A.    We were supposed to speak with him.  We haven't heard

7    from him yet.

8    Q.    Okay.  And in this paragraph 40, it is a Defendant -- it

9    is an e-mail that the Defendant sent again to B.D.?

10   A.    Yes.

11   Q.    And he describes in graphic detail a sexual experience

12   that he had with a boy?

13   A.    Yes.

14   Q.    He uses the term "hand job"?

15   A.    Yes.

16   Q.    And in common language, "hand job" is a sexual act

17   involving a male organ, sexual organ and a hand?

18   A.    Yes.

19   Q.    And he also uses the term "blow job"?

20   A.    Yes.

21   Q.    And that's the Defendant using that term; right?

22   A.    Yes.

23   Q.    Okay.  And then he talks about the child being an

24   extremely tight fit?

25   A.    Yes.

1  Q.   And then directing your attention to the -- page 15, in
2  that second paragraph, he talks about -- and forgive me, but
3  that the child "spooned his well-lubed ass into his groin"?
4  A.   Yes.
5  Q.   And does that appear to be exclusive, explicit
6  discussions about a sex act with a child?
7  A.   Yes.
8  Q.   Now, as far as the DEA identification and it fooling
9  border agents, does it show a willingness to create false
10 documents?
11          MR. KNIZLEY:  Objection.  Speculation.
12          THE COURT:  You can go ahead and answer.
13 A.   Yes.
14 BY MS. MURPHY:
15 Q.   Does it show an ability to create false documents?
16 A.   Yes.
17 Q.   Is the DEA identification sufficiently good to show
18 foreigners in another country?
19 A.   Yes.
20          MR. KNIZLEY:  Objection, Judge.  No predicate.  No
21 predicate for her to be able to give that opinion as to what
22 this may impress on foreign individuals.
23          MS. MURPHY:  For someone with a lack of expertise
24 such as a border agent would have, someone who is naive as to
25 -- for American law enforcement documents.

1          MR. KNIZLEY:  Objection.  No proper predicate.

2          THE COURT:  You can go ahead and give me your

3    opinion, if you know.

4    A.   I don't know.

5    BY MS. MURPHY:

6    Q.   Okay.  And the passport, again, you indicated that it was

7    found on his computer, a digital image?

8    A.   Yes.

9    Q.   In addition to that, did he also possess a current

10   passport?

11   A.   Yes.

12   Q.   And an expired passport?

13   A.   Yes.

14   Q.   And both had blank pages on them?

15   A.   Yes.

16   Q.   Which could be used to create -- you indicated that the

17   information on the one could be used in a genuine passport to

18   change the name and the number; is that --

19   A.   Yes.

20   Q.   I mean, is that what you were saying?  I don't mean to

21   tell you --

22   A.   Yes.

23   Q.   And again, the creation of an American passport shows

24   some degree of expertise in creating documents?

25   A.   I believe so.

1    Q.    And the willingness to create a document?

2    A.    Yes.

3              MR. KNIZLEY:   Your Honor, I would have to object

4    once more to the leading.

5    BY MS. MURPHY:

6    Q.    The -- Mr. Knizley was asking about whether the sending

7    of the sums to Thailand was basically an altruistic act to

8    help a family there?

9    A.    Yes.

10   Q.    Did you, in reviewing all of the documents in this case,

11   all of the data in this case, did you see or notice any other

12   examples of the Defendant being charitable?

13   A.    Yes.

14   Q.    Like what?

15   A.    After boys came over to visit, he would buy them food,

16   buy them -- there's a reference, I believe, in one of the

17   e-mails to KFC.  The victim stated in the interview that he

18   would buy them food, like lunch, you know, rice.

19   Q.    And he would also take movies and things that they would

20   enjoy?

21   A.    Yes.  There is an e-mail regarding going to a water park,

22   and then there's also photos that we discovered of a fairly

23   large group of people because I believe there's some females

24   that are also with them and Mr. Evers at a water park.

25   Q.    And were the children that he talked about feeding, were

1    these children he was either having sex with or trying to have

2    sex with?

3    A.    In reading the e-mails, the way the e-mails flowed,

4    that's how it appeared.

5    Q.    Thank you.  Oh, I'm sorry.  One more question.  You

6    talked about the -- him being a sophisticated user.  You

7    indicated that these -- that some of the numerous amounts of

8    data were sent to a laboratory in New Orleans?

9    A.    Yes.

10   Q.    And what type of people work in that laboratory?

11   A.    All they do is forensics on computers.

12   Q.    That's their job is to open up computers and find out

13   what information they have?

14   A.    Yes.

15   Q.    And they're specially trained to do that?

16   A.    They are.

17   Q.    And are they the ones that told you that these were

18   highly encrypted?

19   A.    Yes.

20   Q.    Are they the ones that told you that it showed a high

21   level of sophistication?

22   A.    Yes, they are, along with the special unit with DOJ in

23   Washington that looked at the computers.

24   Q.    Okay.  And they gave you the same information, that they

25   to date have not been able to beat his encryption?

1    A.    Yes.

2              MS. MURPHY:  Thank you.

3              THE COURT:  Okay.  Thank you.

4         (Brief pause.)

5              THE COURT:  Anything else from the Government with

6    respect to the preliminary hearing?

7              MS. MURPHY:  No, Your Honor.  We'd rely on the

8    affidavit.

9              THE COURT:  And anything from Mr. Knizley with

10   respect to the preliminary hearing?

11             MR. KNIZLEY:  Not with respect to the preliminary

12   hearing.  With respect to the motion to detain, we have a

13   witness as to the motion to detain.

14             THE COURT:  Okay.  Let me take up the preliminary

15   hearing first, and then we'll go into the detention issue.

16        Based on the agent's testimony and the information

17   contained in the affidavit, I find there is probable cause for

18   the allegations contained in the criminal complaint.  The

19   agent's affidavit and testimony provides that a Thailand minor

20   has implicated the Defendant as one who traveled to Thailand

21   to engage in illicit sexual contact with said victim.

22        Further, based on the search that was conducted of the

23   Defendant's records, lots of information was recovered which

24   would provide strong evidence of illegal travel to Thailand

25   for illicit sexual contact with minors, including the bank

1    records, the e-mails, the packing lists.

2         Further, the search of the Defendant's residence produced

3    evidence of child pornography which I'm not going to go into

4    detail about.  It's all detailed in the affidavit.

5         So given what's in the affidavit and the agent's

6    testimony today, I find there is probable cause for the

7    allegations contained in the criminal complaint, so this

8    matter will be set over for further proceedings.

9         I'll address now the issue of release or detention.  Does

10   the Government have anything else you want to offer --

11             MS. MURPHY:  No, ma'am.

12             THE COURT:  -- by way of evidence?  Okay.  And what

13   about you, Mr. Knizley?

14             MR. KNIZLEY:  Yes, ma'am.  We've got Mrs. Evers and

15   -- (inaudible.)

16       (Brief pause.)

17             THE CLERK:  Please come forward.

18                       JEAN B. EVERS,

19        having first been sworn, testified as follows:

20                    DIRECT EXAMINATION

21   BY MR. KNIZLEY:

22   Q.   State your name, please.

23   A.   Jean B. Evers.

24   Q.   And Mrs. Evers, are you married?

25   A.   Yes, I am.

1    Q.   And who are you married to?

2    A.   I'm married to Clarence Edward Evers, Sr., for 55 years.

3    Q.   And is that Buddy back in the back of the courtroom here?

4    A.   Yes, it is.

5    Q.   And y'all came down here today from Conecuh County?

6    A.   Yes, we did.

7    Q.   And where do you live in Conecuh County?

8    A.   In Evergreen, Alabama.

9    Q.   Okay.  And how long have you lived there?

10   A.   Since 1956 for me.  Since --

11   Q.   Go ahead.

12   A.   -- 1933 for my husband.

13   Q.   Okay.  And do y'all have any children?

14   A.   Yes, we do.

15   Q.   How many?

16   A.   Our oldest son is Clarence Edward Evers, Jr., and our

17   youngest son is Jason Scott Evers.

18   Q.   And Clarence is "Bud," sitting in the courtroom here

19   today?

20   A.   That's right.

21   Q.   And how long has Bud lived in the Evergreen area?

22   A.   He's lived in the Evergreen area since birth, which is

23   almost 53 years.

24   Q.   And did he for a short period of time live overseas?

25   A.   He brief -- he went to college for four years at

1    Birmingham Southern.  When he got out of college, he worked

2    for a couple of years and lived in Demopolis.  He was in IT at

3    James River Corporation.

4         He then came back to Evergreen for -- until '88, which

5    would have been to '98 for about 10 or 12 years, and then he

6    was in the Mideast in Saudi Arabia for four or five years.

7    I'm not totally sure.  I know he came back in 2002.

8    Q.    While in the Middle East, was he working for a contractor

9    for the Department of Defense?

10   A.    Yes.  Yes, primarily, I believe, on Y2K.

11   Q.    And after going to the Middle East, when he returned,

12   what occupation did he have?

13   A.    Teaching.

14   Q.    Okay.  And does -- what did he teach?

15   A.    He taught some curriculum courses, but primarily to do

16   with computers.  He is wonderful at making mountains into mole

17   hills.

18   Q.    And is this at Evergreen High School?

19   A.    Yes, yes.

20   Q.    And how long has he been at Evergreen High School?

21   A.    He's been at Evergreen High School -- he taught briefly

22   at Sparta Academy.

23   Q.    All right.

24   A.    And they really wanted him to stay, but he wanted to get

25   into -- there was a difference in the pay.

1   Q.   Yes, ma'am.

2   A.   And he started -- he worked days, and then three nights a

3   week would drive to Montgomery to get further education for

4   working in the educational fields and got his Master's.

5        And he started teaching at Hillcrest High School -- I'm

6   not really positive.  It seems like it was -- I'm not

7   positive, but he's been teaching in all about 15 years.

8   Q.   Yes, ma'am.  And do you know what grades he teaches?

9   A.   I believe it's 9th through the 12th, but I'm not

10  positive.

11  Q.   Okay.  Do you know of any complaints anyone in the

12  Evergreen or Conecuh County community has ever made about

13  Bud's behavior or interaction with people or children and

14  students at school?

15  A.   Quite the contrary.  I've had mothers cry and tell me

16  what a difference it has made for their child's interest in

17  school to have -- people have called our son "Mr. Bud" since

18  he was 10 when he was den chief with Scouts -- so for Mr. Bud

19  to be their instructor.

20  Q.   And would it be fair to say he was a popular and

21  well-respected teacher at the high school?

22  A.   Extremely so from the coaches to school board members to

23  the principals and the students also.

24  Q.   And Evergreen is a small community; is it not?

25  A.   Yes.

1   Q.   Everybody knows everybody, and everybody knows what

2   everybody thinks about everybody --

3   A.   Oh, yes.

4   Q.   And everybody knows what everybody thinks about

5   everybody?

6   A.   Oh, yes.

7   Q.   And how is your son thought of in that community?

8   A.   Exemplary.

9   Q.   Now --

10   A.   May I?

11   Q.   Go ahead.

12   A.   In his graduating class, who's most likely to succeed, it

13   was a big deal in Evergreen to be the Southern Pine

14   representative and go to Washington.  And in Washington, he

15   was selected to go to California.  He just has a way of

16   putting the needs of the group first and is altruistic.  And I

17   know that I'm his mother, but he is, he's very altruistic.

18   And if he's got an assignment, from the time he was a little

19   boy, if he said he was going to do something, it was not only

20   done well, it was done ahead of time.

21   Q.   Mrs. Evers, you mentioned the Boy Scouts; is that

22   correct?

23   A.   Yes.

24   Q.   Was Bud involved in the Boy Scouts?

25   A.   Oh, yes.  In Evergreen, there's not a bowling alley.

1    Eventually -- there's no picture show.  Boy Scouts was very

2    important for developing character and for going to camp.  Our

3    particular troop was based out of our church.

4    Q.    What church is that?

5    A.    Oh, Evergreen First United Methodist.

6    Q.    All right.  And did Bud participate as a Scout himself?

7    A.    Yes.  Eagle Scout.

8    Q.    All right.  And after his participation as a Scout, did

9    he participate in leadership positions in the scouting?

10   A.    Oh, yes.  He worked for $10 a week when he could have

11   made a hundred at home working, but he worked for $10 a week

12   at Camp Uchee.  And the scout director praised him to an

13   incredible amount for the wit and humor he had with kids.

14   Q.    Do you have an idea of how long he was in the Boy Scout

15   leadership, how long he served as a Boy Scout leader?

16   A.    Well, yes.  He was about 13 when he started going.  And

17   after graduating from college, he delayed reporting to his

18   first job because they begged him to come back down there, the

19   district manager did, to be -- he and a friend of his were

20   co-headed up.  You know, you move up the ranks.  So they

21   co-headed the --

22   Q.    Would it be fair to -- I'm sorry, go ahead.  Go ahead.

23   Would it be fair to say it was several years he's been

24   involved in Boy Scouts and the Boy Scout leadership?

25   A.    Oh, yes.  After he came back then to Evergreen, he worked

1    as a volunteer with Scouts.  And even as recently, I think, as

2    -- I would guess five or six years ago, they were starting a

3    new Scout troop, and some of the daddies who happened to be

4    attorneys --

5    Q.    Right.

6    A.    -- weren't familiar with what to do, so they asked Bud if

7    he would participate with them helping get that troop started.

8    Q.    Were members of law enforcement also involved in the same

9    Boy Scout organization?

10   A.    Yes.  Matter of fact, when we used to -- you know, it's

11   hard to get parents -- they went to DeFuniak Springs.  That's

12   a long drive down a narrow, two-lane road.  Randy Brock many

13   times rode with us.

14   Q.    And Randy Brock is the Sheriff of Conecuh County?

15   A.    Yeah.

16   Q.    Okay.

17   A.    His --

18   Q.    Lawyers, the law enforcement, judges?

19   A.    Yes.

20   Q.    Pillars of the community or responsible people in the

21   community were around him while he was in positions of

22   leadership in Boy Scouts; is that correct?

23   A.    Yes, sir.  And I'm assuming that they thought highly of

24   him because they never passed me or his father as recently as

25   two weeks ago hugging our necks when they see and greeted both

1    of us.

2    Q.    Yes, ma'am.

3    A.    I mean, it's a small town.

4    Q.    And in this small town, did you ever hear of or become

5    aware of any complaints about Bud's interaction with Boy

6    Scouts or younger people while he was in this long-time

7    involvement in the leadership of Boy Scouts?

8    A.    Quite the contrary.  They always wanted him to

9    participate even more.

10   Q.    And how far from your home does Bud live?

11   A.    If the red light stays green, two minutes.

12   Q.    All right.  Five or six blocks, something like that?

13   A.    About like that.

14   Q.    Okay.

15   A.    We live kind of off the beaten track.  Bud's house is on

16   the main highway.  It's by the war memorial.  And it's

17   actually the house that the doctor that delivered Bud's father

18   built and that he -- the doctor grew up in.

19   Q.    There's a lot of community ties that Bud has in the

20   Evergreen area?

21   A.    Big time.

22   Q.    And did Bud have a house before this house?

23   A.    Yes, he did.

24   Q.    And does he still own that house?

25   A.    Yes.  It's two doors down from a church and about half a

1    block from the post office.  It's on the main road.

2    Q.    And that's a rental house now; right?

3    A.    Yes, yes.

4    Q.    And did you and your husband help him buy the house to

5    begin with, loan him some money?

6    A.    Well, we loaned him some money.  There's interest paid on

7    the money.

8    Q.    Right.

9    A.    And regular payments made.

10   Q.    And so he has one piece of real estate he lived in for

11   some period of time that y'all had helped him with, and he

12   paid you back?

13   A.    Yes.

14   Q.    And then he bought another piece of real estate that he

15   now lives in, and both of those pieces of real estate are very

16   near your home?

17   A.    Yes.  And there's a third -- a second rental house, a

18   smaller unit that was burned out nextdoor to one of the

19   attorneys in town that he got at a good price and worked

20   really hard to bring it up to decent, affordable housing.

21   Q.    And does Bud help y'all out around the house?

22   A.    Bud not only helps with big things, like when there's

23   open heart surgery, it's so many little things.  He's at our

24   house three or four days a week.  He makes us laugh.

25         My husband -- is it all right if I digress a little bit?

1  Q.   Yes, ma'am.

2  A.   My husband has had two open heart procedures, and he's

3  had colorectal cancer, chemo and radiation, and now we're

4  dealing with Alzheimer's dementia.  And Bud probably cooks two

5  meals a week for us and delivers them.  He never leaves or

6  comes in without hugging and kissing both of us, and he always

7  says, "Now, if y'all get into anything, you call me and let me

8  know what I can do."  He said, "I'd prefer a little head

9  notice if you can do that," but it's big things and little

10  things.

11  Q.   Do these allegations come as a shock to you and your

12  husband?

13  A.   Yes, sir.

14         MR. KNIZLEY:  All right.  The prosecutor may have

15  some questions for you.

16         THE WITNESS:  Thank you.

17                   CROSS EXAMINATION

18  BY MS. MURPHY:

19  Q.   Good morning, ma'am.  Ma'am --

20  A.   It's afternoon now.

21  Q.   Yeah, it is.  We've been -- you've been out there waiting

22  all morning.  You indicated that this came as a shock to you?

23  A.   Yes, ma'am.

24  Q.   What did your son tell you when the Homeland Security

25  raided his house and executed a search warrant in April?

1    A.    Actually, I believe it was maybe March.

2    Q.    It doesn't matter.  But what did he tell you?

3    A.    I'm just thinking that Easter came early that year, and

4    my husband and I had been to church to a meeting, and we were

5    on the way home.  And as Bud's mother, we rode by his house

6    and I said, "Those men are parked all in Bud's drive.  What

7    are they doing --"

8    Q.    So he had not gone to church with you?

9    A.    He was working.  It was a weekday.  It wasn't on a

10   weekend; it was a weekday.

11   Q.    Okay.  Uh-huh.

12   A.    We have -- pre-Easter week, we have something at church

13   every day just for a couple hours.

14   Q.    Okay.

15   A.    But we called, checking on that, and he told us that they

16   had removed some items from his house and that they had

17   permission to be there, that he had left them because he had

18   to go on to school.

19   Q.    Did he tell you he was under investigation for traveling

20   abroad for commercial sex acts with children?

21   A.    No, ma'am.

22   Q.    Did he tell you he was under investigation for possessing

23   items of child pornography?

24   A.    No, ma'am.

25   Q.    So he did not share that information with you?

1    A.    We have discussed nothing about any of that.

2    Q.    Okay.  And despite that, you're very close with him;

3    right?

4    A.    Extremely.

5    Q.    And in fact, when the times when he went overseas, you

6    helped him keep track of his expenses and pay his bills?

7    A.    We would pay his light -- you mean like the light bill?

8    Sometimes he prepaid it, but with his money that he left --

9    Q.    Yes, yes, with his money.  And you were not happy when he

10   went to Saudi Arabia and was gone.  You wanted to be closer to

11   him?

12   A.    I missed him really bad, but I was excited for him at the

13   opportunity.

14   Q.    And, well, and in fact, you thought it wasn't worth it

15   for the extra money; you wanted him home?

16   A.    No.  It wasn't so much miss him so much, but part of that

17   love is what your child wants to pursue in the way of his

18   career.

19   Q.    You weren't happy with all of his expenses for computer

20   equipment; right?

21   A.    (No audible response.)

22   Q.    You wrote him about it?

23   A.    Never, never, never.

24   Q.    You didn't write him about an imager or a printer that he

25   had purchased and that you were making payments on with his

1    money?

2    A.    No.

3    Q.    Yes, ma'am.  And you did not return the phone calls of

4    Pretrial Services officers yesterday, did you?

5    A.    That was --

6    Q.    Did you?

7    A.    No.  But may I explain why?

8    Q.    Sure.

9    A.    I -- we -- we don't have a cell phone.  We've got a land

10   line.

11   Q.    Uh-huh.

12   A.    And we get scam calls all the time.  And we had been out

13   of town until about 12:30, and when he got home, as I was

14   putting our meal together, our pastor appeared at the door,

15   and he just said, "I wanted to come and see y'all and visit

16   with you."  I said, "Great.  Come on in and sit down.  You

17   want some Kool-Aid or you want some lemonade?"  "No, no, no,

18   just wanted to visit with you."

19        So he stayed about an hour-and-a-half, and the phone kept

20   ringing.  It was the NRA.  And then somebody said -- I didn't

21   catch the child services.  You understand the phone was right

22   by where the pastor was.  So I grabbed it and I -- whoever it

23   was said they wanted to talk with me.  I thought it was a

24   scam, and I especially did when they said, "Your son's in

25   Federal Court at 2:00 today, and he will be calling you at --

1  he'll be home at 3."

2      And I thought, huh, if he's in Federal Court, there's no

3  way he can be home at -- this is somebody, another person

4  scamming us.  So I just said, "Our pastor is here.  Can you

5  call back about 3?"  And I had picked up -- we have five

6  phones.  I had picked up a different phone, and I accidentally

7  left it off the hook and didn't discover it until about 4:30.

8  Q.   And you found out your son was, in fact, in jail?

9  A.   I did.

10  Q.   And how did you find out?

11  A.   And I realized then that our pastor had probably heard

12  it.  And although he didn't say it to us, that was why he had

13  appeared.

14  Q.   How did you find out your son was in jail?

15  A.   How did I find out?

16  Q.   Yes, ma'am.

17  A.   I had -- I want to be real precise.  I'm trying to

18  remember if actually it was a phone call from a facility with

19  an inmate wanting us to accept a collect call.  That's what it

20  was.  That's the first I found out, and it was Bud.

21  Q.   And you accepted -- your phone was working by then?

22  A.   I had found out I left it off the hook, so I hung it up,

23  yes.

24  Q.   And did you call Pretrial Services after you found out it

25  was not a scam?

```
1    A.   I didn't put together that -- I did not know -- I didn't

2    hear the part of anything to do with Pretrial Services.  And

3    actually, after all the pieces kind of fell together, after I

4    talked with Bud, after I spoke with Mr. Dennis, then I thought

5    that that had been his assistant that had tried to call us.  I

6    didn't catch on to the fact that it was Pretrial Services.

7    Q.   You had no problem getting the phone call from Mr.

8    Dennis, though?

9    A.   He called much later even after Bud.

10            MS. MURPHY:  Okay.  Okay.  Thank you.

11            THE WITNESS:  Thank you, ma'am.

12                      REDIRECT EXAMINATION

13   BY MR. KNIZLEY:

14   Q.   Ma'am, did I mention I had had some difficulty getting

15   with you earlier?

16   A.   Oh, you did.  When we spoke, you said you had.

17   Q.   And I think --

18   A.   And Bud had said he had too.

19   Q.   And I think you and I spoke around 7:15, 7:30, something

20   like that?

21   A.   Correct.

22   Q.   And you said -- the prosecutor asked you about your not

23   having any conversation with Bud about the law enforcement

24   searching his home.  Did Bud give you any reason why you

25   didn't have any conversation with him about that?
```

1    A.    No, he didn't.  He just said he didn't know what it was

2    about.

3    Q.    Did you and I have a conversation about any instructions

4    Bud may have gotten in connection with whether he should

5    discuss the raid?

6    A.    Yes.

7    Q.    What -- did he say anything I may have told him in

8    connection with that?

9    A.    Not to discuss anything with anybody.  And also, we were

10   not to talk about it to each other.  And we never did.  And I

11   --

12   Q.    That's what Bud said my instructions to him were?

13   A.    Correct.

14   Q.    And last night, you told me he abided by that strictly?

15   A.    Yes, yes.

16   Q.    All right.

17   A.    It was not easy to do.

18   Q.    Yes, ma'am.  If in the event that the Court sees fit to

19   release Bud and require that he stay at your home, would that

20   be okay?

21   A.    Joyfully.  I don't just love him; I like him a lot, and

22   his daddy does too.

23            MR. KNIZLEY:  Thank you very much, Mrs. Evers.

24            THE WITNESS:  Thank you.

25            MR. KNIZLEY:  You can step down.

1    THE COURT:  Well, let me ask.  So when you passed by

2    and see his home being searched, you didn't think that odd?

3    THE WITNESS:  I did.  I turned to my husband and I

4    said, "Buddy, look at all those cars at Bud's house --"

5    THE COURT:  And they were not just cars; they were

6    police cars?

7    THE WITNESS:  Yes.  But part of them were over at

8    the memorial, and it was -- I thought they were just getting

9    ready for something to do.  It's a small town.  People pull up

10   in your driveway and park a lot.  And to tell you the truth,

11   this is kind of tacky, but we've been in church for two hours

12   and they had served a lot of coffee, and we did need to get on

13   home.

14   THE COURT:  So when you talked to him about it, you

15   didn't want to know why they would be there searching his

16   house?

17   THE WITNESS:  Of course, I did.  And he said he did

18   not know either yet.

19   THE COURT:  Well, that was back in April.  And

20   between then and him being arrested, you guys never had any

21   discussion about that?

22   THE WITNESS:  No, ma'am.  His attorney had said not

23   to.

24   THE COURT:  And you just took it at that, that you

25   just didn't need to find out any more about it?

1          THE WITNESS:  I longed to find out.  My mind just

2    went everywhere, but I honored that wish.  I mean, Bud is an

3    adult.  I had heard wonderful things about his attorney, and I

4    --

5          THE COURT:  So you knew he had an attorney at that

6    point?

7          THE WITNESS:  Oh, I knew he had an attorney because

8    he had told me --

9          THE COURT:  So why did he tell you he was getting an

10   attorney?

11         THE WITNESS:  He thought it was best.

12         THE COURT:  Did he tell you why he thought he needed

13   an attorney?

14         THE WITNESS:  He thought it was best.

15         THE COURT:  Okay.  And his travels to Thailand, you

16   never asked why he was going there or what the purpose of it

17   was for?

18         THE WITNESS:  I know that when he first went to

19   Thailand, there were a lot of people where he worked that

20   went.

21         THE COURT:  Like who?

22         THE WITNESS:  Families.  And the guy in Brewton that

23   has a Cadillac dealership had a fit.  He said, "Oh, my family

24   and I love to vacation there."  And right after his

25   grandmother died, he sent me a picture of a shrine that he

1 made, a memorial in honor of Bud's grandmothers and me.  It's

2 totally devoted to women, which I liked.  But I thought it was

3 a much needed vacation in a beautiful place.

4          THE COURT:  So you never questioned why --

5          THE WITNESS:  No, ma'am, I did not.

6          THE COURT:  -- he was going year after year?  Okay.

7 Okay.  Anything further?

8          MS. MURPHY:  No, ma'am.

9          MR. KNIZLEY:  No, ma'am.

10          THE COURT:  Okay.  You can step down.  Thank you,

11 ma'am.

12          MR. KNIZLEY:  You can stay in the courtroom too.

13          THE WITNESS:  Thank you.

14          THE COURT:  Any other witnesses, Mr. Knizley?

15          MR. KNIZLEY:  No, ma'am.

16          THE COURT:  Okay.  I'm going to take this one under

17 submission.  He'll be remanded to the custody of the Marshals,

18 and I'll issue a written order in a day or two.

19     Okay.  Thank you.

20          MR. KNIZLEY:  Thank you.

21

22     (Proceedings concluded at 1:36:34 p.m. this date.)

23

24

25

1                           <u>CERTIFICATE</u>

2

3    STATE OF ALABAMA)

4    COUNTY OF MOBILE)

5

6        I do hereby certify that the above and foregoing

7    transcript of proceedings in the matter aforementioned was

8    recorded using digital audio recording equipment and reduced

9    to writing under my personal supervision using computer-aided

10   transcription, and that the foregoing represents a true and

11   correct transcript of the proceedings upon said hearing.

12       I further certify that I am neither of counsel nor

13   related to the parties to the action, nor am I in anywise

14   interested in the result of said cause.

15       I further certify that I am duly licensed by the Alabama

16   Board of Court Reporting as a Certified Court Reporter as

17   evidenced by the ACCR number following my name found below.

18

19

20

21                        <u>s/Mary Frances Giattina</u>
                          Mary Frances Giattina, CCR, RDR, CRR
22                        ACCR #181
                          Official Court Reporter
23                        U.S. District Court
                          Southern District of Alabama
24                        P.O. Box 3021
                          Mobile, Alabama  36652-3021
25                        (251) 422-4410